IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELETRONIC FRONTIER FOUNDATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DEPARTMENT OF JUSTICE | ) |
| | ) |
| Defendant, | ) |
| | ) |
| | ) |

Civil Case No. 1:15-cv-00200 (CKK)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant United States Department of Justice ("DOJ" or "Defendant") respectfully moves for summary judgment.  The reasons for this Motion are set forth in the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, the Statement of Material Facts as to Which There Is No Genuine Issue, and the declarations of (1) David M. Hardy, Section Chief of the Record/Information Dissemination Section, Records Management Division, Federal Bureau of Investigation; (2) William E. Bordley, Associate General Counsel of the United States Marshals Service; (3) Peter C. Sprung, Trial Attorney, Criminal Division, U.S. Department of Justice; (4) Vanessa R. Brinkmann,  Senior Counsel, Office of Information Policy; and (5) Katherine L. Myrick, Chief, Freedom of Information/Privacy Act Unit, Drug Enforcement Administration.  A proposed order is filed concurrently herewith.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES
DC Bar No. 369455
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELETRONIC FRONTIER FOUNDATION,       )
                        Plaintiff,   )
                                     )
            v.                       )          Civil Case No. 1:15-cv-00200 (CKK)
                                     )
DEPARTMENT OF JUSTICE                )
                        Defendant,   )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF AUTHORITIES** ............................................................................................. iii

**INTRODUCTION** .......................................................................................................... 1

**BACKGROUND** ........................................................................................................... 1

  **A.** **FBI's Response to EFF's FOIA Request** ............................................................ 3

  **B.** **Criminal Division's Response to EFF's FOIA Request** ...................................... 4

  **C.** **USMS's Response to EFF's FOIA Request** ......................................................... 5

  **D.** **OIP's Response to Documents Referred by the Criminal Division and the USMS** ..... 5

  **E.** **DEA's Response to Document Referred by the Criminal Division** ...................... 5

**ARGUMENT** ................................................................................................................. 6

  **I.** **ITEM 1 OF EFF'S REQUEST FAILS TO REASONABLY DESCRIBE THE RECORDS SOUGHT** ............................................................................................ 6

  **II.** **THE USMS CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS** ............................................................................................................ 8

  **III.** **THE FBI'S REFUSAL TO CONFIRM OR DENY THE EXISTENCE OF CERTAIN RECORDS SOUGHT BY EFF IS APPROPRIATE UNDER EXEMPTIONS 3 AND 7(E)** ...................................................................................... 10

    **A.** **FBI's *Glomar* Response Is Proper Under Exemption 7(E)** ................................... 11

    **B.** **FBI's *Glomar* Response is Proper under Exemption 3** ......................................... 15

  **IV.** **DEFENDANT PROPERLY WITHHELD INFORMATION UNDER APPLICABLE EXEMPTIONS** ............................................................................ 16

    **A.** **The FBI Properly Withheld Information Pursuant to Exemption 1** ...................... 17

    **B.** **The FBI Properly Withheld Information Pursuant to Exemption 3** ...................... 19

    **C.** **The FBI and the USMS Properly Withheld Record Pursuant to Exemption 4** ..... 20

    **D.** **Defendant Properly Withheld Information Pursuant to Exemption 5** ................... 22

      **1.** **The Criminal Division Properly Withheld Records under Exemption 5** ........... 23

      **2.** **The USMS Properly Withheld a Record under Exemption 5** ............................ 25

      **3.** **The DEA Properly Withheld a Record under Exemption 5** ............................... 26

      **4.** **The FBI Properly Withheld Information under Exemption 5** ............................ 27

     **5.**    **OIP Properly Withheld Records under Exemption 5** ............................................ 28

  **E.**    **Defendant Properly Withheld Information Pursuant to Exemption 7** ................... 30

    **1.**    **FBI Properly Withheld Information under Exemption 7(A)** ............................... 31

    **2.**    **FBI Properly Withheld Information Under Exemption 7(D)** ............................. 32

    **3.**    **Defendant Properly Withheld Information under Exemption 7(E)** ................... 35

  **F.**    **Defendant Released All Reasonably Segregable Documents** ................................ 43

**CONCLUSION** ......................................................................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*ACLU v. U.S. Dep't of Def.*,
   628 F.3d 612 (D.C. Cir. 2011) .......................................................................... 17-18

*ACLU of N. Cal. V. U.S. Dep't of Justice*
   70 F. Supp. 1018 (N.D. Cal. 2014) ........................................................................24

*Al Turki v. U.S. Dep't of Justice*,
   No. 14-cv-0802, 2016 WL 1258581 (D. Colo. March 30, 2016) .................................... 37, 40

*Allard K. Lowenstein Int'l Human Rights Project v. DHS*,
   626 F.3d 678 (2d Cir. 2010) .................................................................................. 11

*Am. Fed'n of Gov't. Empls. v. U.S. Dep't of Commerce*,
   907 F.2d 203 (D.C. Cir. 1990) ................................................................................ 6

*Amnesty Int'l v. CIA*,
   No. 07-5435, 2008 WL 2519908 (S.D.N.Y. June 19, 2008) .................................... 7

*Assassination Archives & Research Ctr. v. CIA*,
   720 F. Supp. 217 (D.D.C. 1989) ............................................................................. 6

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
   473 F.3d 312 (D.C. Cir. 2006) ............................................................................... 9

*Barnard v. U.S. Dep't of Homeland Sec.*,
   598 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................... 36

*Billington v. U.S. Dep't of Justice*,
   11 F. Supp. 2d 45 (D.D.C. 1998)........................................................................... 33

*Campbell v. U.S. Dep't of Justice*,
   164 F.3d 20 (D.C. Cir. 1998) ................................................................................ 17

*Cappabianca v. Comm'r, Customs Serv.*,
   847 F. Supp. 1558 (M.D. Fla. 1994) ...................................................................... 39

*Catledge v. Mueller*,
   323 Fed. Appx 464 (7th Cir. 2009)........................................................................ 10

*CIA v. Sims*,
   471 U.S. 159 (1985) .............................................................................. 15, 16, 20, 39

*Coastal States Gas Corp. v. U.S. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .............................................................................. 24

*Critical Mass Energy Project v. Nat'l Regulatory Comm'n*,
   975 F.2d 871 (D.C. Cir. 1992) .............................................................................. 21

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    244 F.3d 144 (D.C. Cir. 2001) ................................................................. 21, 22

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) ................................................................. 18, 39

*DiBacco v. U.S. Army*,
    795 F.3d 178 (D.C. Cir. 2015) ................................................................. 15, 20

*Dow v. Carnegie-Ill. Steel Corp.*,
    70 F. Supp. 1016 (N.D. Cal. 1947) ................................................................. 24

*Durrani v. U.S. Dep't of Justice*,
    607 F. Supp. 2d 77 (D.D.C. 2009) ................................................................. 11

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
    384 F. Supp. 2d 100 (D.D.C. 2005) ................................................................. 28

*FBI v. Abramson*,
    456 U.S. 615 (1982) ................................................................................. 17

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) ................................................................. 15, 18

*Gardels v. CIA*,
    689 F.2d 1110 (D.C. Cir. 1982) ................................................................. 10

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999) ................................................................. 18

*Goland v. CIA*,
    607 F.2d 339 (D.C. Cir. 1978) ................................................................. 15

*Gov't Accountability Project v. U.S. Dep't of Justice*,
    852 F. Supp. 2d 14 (D.D.C. 2012) ................................................................. 25

*Halperin v. Cent. Intelligence Agency*,
    629 F.2d 144 (D.C. Cir. 1980) ................................................................. 16

*Hamdan v. U.S. Dep't of Justice*,
    797 F.3d 759 (9th Cir. 2015) ................................................................. 11

*Heggestad v. U.S. Dep't of Justice*,
    182 F. Supp. 2d 1 (D.D.C. 2000) ................................................................. 25

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ................................................................................. 23

*Hudgins v. IRS*,
    620 F. Supp. 19 (D.D.C. 1985), aff'd, 808 F.2d 137 (D.C. Cir. 1987)................... 7

*Hunt v. CIA,*
   981 F.2d 1116 (9th Cir. 1992) .......................................................................... 10

*Jewett v. U.S. Dep't of State,*
   No. 11-cv-1852 RLW, 2013 WL 550077 (D.D.C. Feb. 14, 2013) ........................... 11-12, 41

*John Doe Agency v. John Doe Corp.,*
   493 U.S. 146 (1989) ................................................................................. 16, 17

*Johnson v. Exec. Office for U.S. Att'ys,*
   310 F.3d 771 (D.C. Cir. 2002) ........................................................................ 43

*Judicial Watch, Inc. v. FDA,*
   449 F.3d 141 (D.C. Cir. 2006) ........................................................................ 20

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.,*
   736 F. Supp. 2d 202 (D.D.C. 2010) .............................................................. 28, 30

*Judicial Watch, Inc. v. U.S. Dep't of State,*
   No. 15-cv-690, 2016 WL 1367731 (D.D.C. Apr. 6, 2016) ............................... 6, 7, 8

*Krikorian v. U.S. Dep't of State,*
   984 F.2d 461 (D.C. Cir. 1993) ........................................................................ 15

*Krohn v. U.S. Dep't of Justice,*
   628 F.2d 195 (D.D.C. 1980) ............................................................................ 7

*Labow v. U.S. Dep't of Justice,*
   66 F. Supp. 3d 104 (D.D.C. 2014) .............................................................. 12, 37, 41

*Larson v. U.S. Dep't of State,*
   565 F.3d 857 (D.C. Cir. 2009) ........................................................................ 17

*Light v. U.S. Dep't of Justice,*
   968 F. Supp. 2d 11 (D.D.C. 2013) .................................................................... 41

*Mapother v. U.S. Dep't of Justice,*
   3 F.3d 1533 (D.C. Cir. 1993) ......................................................................... 24

*Mayer Brown L.L.P. v. IRS,*
   562 F.3d 1190 (D.C. Cir. 2009) .................................................................... 12, 14

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) ........................................................................ 28

*Moore v. Bush,*
   601 F. Supp. 2d 6 (D.D.C. 2009) ...................................................................... 7

*Nat'l Parks & Conserv. Asso. v. Morton,*
   498 F.2d 765 (D.C. Cir. 1974) ........................................................................ 21

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ........................................................................... 22, 23

*Ortiz v. U.S. Dep't of Health & Human Servs.*,
70 F.3d 729 (2d Cir. 1995) .......................................................................... 33

*Oglesby v. U.S. Dep't of the Army*,
920 F.2d 57 (D.C. Cir. 1990) ........................................................................ 8

*Phillip v. CIA*,
546 F.2d 1009 (D.C. Cir. 1976) ................................................................... 10

*Pub. Emps. for Envtl. Responsibilty v. U.S. Section, Int'l Boundary & Water Comm'n*,
740 F.3d 195 (D.C. Cir. 2014) ................................................ 11, 12, 35, 36

*Quinon v. FBI*,
86 F.3d 1222 (D.C. Cir. 1996) ..................................................................... 30

*SafeCard Servs. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ..................................................................... 9

*Showing Animals Respect & Kindness v. U.S. DOI*,
730 F. Supp. 2d 180 (D.D.C. 2010) ............................................................. 36

*Stephens v. U.S. Dep't of Justice*,
26 F. Supp. 3d 59 (D.D.C. 2014) ................................................................. 33

*Summers v. U.S. Dep't of Justice*,
517 F. Supp. 2d 231 (D.D.C. 2007) ............................................................. 30

*Timken Co. v. U.S. Customs Serv.*,
491 F. Supp. 557 (D.D.C. 1980) .................................................................. 39

*United States v. Jones*,
132 S. Ct. 945 (2012) ............................................................. 23, 24, 26, 27

*United States v. Rigmaiden*,
844 F. Supp. 2d 982 (D. Ariz. 2012) ...................................................... 39, 40

*Valzquez v.U.S. Dep't of Justice*,
887 F. Supp. 2d 114 (D.D.C. 2012) ............................................................. 10

*Voinche v. FBI*,
46 F. Supp. 2d 26 (D.D.C. 1999) ................................................................. 32

*Weisberg v. U.S. Dep't of Justice*,
745 F.2d 1476 (D.C. Cir. 1984) ..................................................................... 8

*West v. Spellings*,
539 F. Supp. 2d 55 (D.D.C. 2008) ................................................................. 7

*Williams v. FBI*,
    69 F.3d 1155 (D.C. Cir. 1995) ............................................................................. 32

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ............................................................................. 17

**Federal Statutes**

5 U.S.C. § 102A(i) .................................................................................. 15, 16, 20

5 U.S.C. § 552 ......................................................................................... *passim*

21 U.S.C. § 801 ..................................................................................................31

28 C.F.R. § 0.111 ...............................................................................................31

28 C.F.R. § 0.85 ................................................................................................ 31

28 U.S.C. § 533 ................................................................................................. 31

28 U.S.C. § 534 ................................................................................................. 31

28 U.S.C. § 561 ................................................................................................. 31

28 U.S.C. § 564 ................................................................................................. 31

50 U.S.C. § 3024 ................................................................................. 15, 16, 20

**Executive Orders**

E.O. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ......................................... 18, 19, 34

E.O. 12,333, 46 Fed. Reg. 59941 (Dec. 4, 1981) .......................................................31

**Legislative History**

H. Rep. 93-876, 93d Cong., 2d Sess. 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267 ..................6

**INTRODUCTION**

This action concerns requests submitted under the Freedom of Information Act ("FOIA"),
5 U.S.C. § 552, by plaintiff Electronic Frontier Foundation ("EFF") for records concerning cell
site simulator devices (or International Mobile Subscriber Identity ("IMSI") catchers operated
from airplanes. The requests were submitted to three components of the Department of Justice
("DOJ") – the Federal Bureau of Investigation ("FBI"), the United States Marshals Service
("USMS") and the Criminal Division.  EFF is not contesting the adequacy of the search conducted
by the FBI or the Criminal Division or withholdings made under Exemption 6 and 7(C).  The
only issues are (1) whether item 1 of EFF's request fails to "reasonably describe[]" the records
sought, 5 U.S.C. § 552 (a)(3)(A)(i); (2) whether USMS conducted an adequate search; (3)
whether the FBI properly refused to confirm or deny the existence of certain records sought by
the request; and (4) whether information was properly withheld under Exemptions 1 (classified
information), 3 (information protected by a statute), 4 (confidential financial/commercial
information), 5 (intra-agency and inter-agency memoranda), 7(A) (law enforcement
investigations), 7(D) (confidential sources), and 7(E) (law enforcement techniques and
procedures).  The DOJ is entitled to judgment on each of these issues. Therefore, this court
should grant summary judgment for DOJ.

**BACKGROUND**

By letters dated November 20, 2014, plaintiff submitted a FOIA request to FBI, the
Criminal Division and the USMS seeking access to records "generated between January 1, 2007

and the present concerning 'dirtboxes' or other IMSI catcher devices[1] operated from planes

(hereinafter referred to as 'device' or 'devices'), including:

1. the case name or docket numbers of all criminal cases, federal or state, open or closed, in which data collected from a device aided in arrest;

2. any and all records detailing DOJ or FBI's use of these devices and data collected from these devices, including but not limited to:

    a. logs of who, when and why the devices were used;
    b. any and all communications between DOJ, FBI and other federal and/or state agencies concerning the devices, including requests from DOJ, FBI or other federal and/or state agencies for USMS to use the devices to collect data on their behalf;
    c. records discussing legal protocols or standards for using the devices;
    d. model or sample requests for subpoenas, court orders or warrants to use the devices and/or model or sample affidavits in support of legal requests to use the devices;
    e. policies and procedures for using the devices -- including agency protocol or standards for approving use of the devices -- and for storing, accessing and sharing data collected by the devices;
    f. policies and procedures for deleting data collected using the devices;
    g. geographic locations and/or metropolitan areas where the devices have been deployed;

3. records discussing how many phones a device may collect data from during a given flight, including how many phones are specifically targeted during a flight, how many phones are not specifically targeted but still have data collected from them; and how many "non-suspect phones" are "let go" by the device.

4. training and promotional records and materials, including presentations, memoranda, policies and guidelines concerning the use of the devices, whether produced or created by a federal agency, or produced, created or received from some other third party, including the device manufacturer;

---

[1] Every cell phone has an International Mobile Subscriber Identity ("IMSI"), which is a unique number stored on a cell phone identifying it as a user of the cellular network. Hardy Decl. at page 2 n.1. Although technically different devices, the term "IMSI catchers" and "cell site simulators" are often used interchangeably by laypersons to describe devices to detect a cell phone's IMSI. *Id.* As explained on page 2 of EFF's request, devices manufactured by a particular company, Digital Receiver Technology, Inc. ("DRT"), are sometimes referred to as "dirtboxes" based on an acronym for the company. *Id.* For purposes of this motion, Defendant uses the term IMSI catcher and cell site simulators interchangeably.

5. records describing the types of data collected by the devices and whether the devices are used to jam signals and/or retrieve data from a target phone such as texts or photos;

6. contracts, service agreements or memoranda of understanding concerning the devices between Department of Justice or FBI and the device manufacturer or between DOJ or FBI and any other federal or state agency;

7. all Privacy Impact Assessments, System of Records Notices or other similar documents concerning the collection and use of data using the devices;

8. procedures or protocol concerning data collected using the devices from cell phones or cell phone users that are not the target of an investigation;

9. communications discussing the legality of operations using the devices as well as internal safeguards; and

10. communications with Congress concerning the devices.

*See* Ex. A to Declaration of David M. Hardy ("Hardy Decl."); Ex. A to Declaration of Peter C. Sprung ("Sprung Decl.') and Ex. A to Declaration of William E. Bordley ("Bordley Decl.").

**A. FBI's Response to EFF's FOIA Request.**

By letter dated February 19, 2015, the FBI advised EFF that it neither confirms nor denies the existence of records responsive to plaintiff's request pursuant to FOIA exemption (b)(7)(E), 5 U.S.C. § 552(b)(7)(E). *See* Ex. D to Hardy Decl. By letter dated June 17, 2015, the FBI informed EFF that it was revising its response. *See* Ex. E to Hardy Decl. The letter advised that category 1 of the EFF's request did not describe the records sought in a manner to allow FBI personnel to locate records with a reasonable amount of effort. The letter further advised that it could neither confirm nor deny the existence of records on the following topics: (1) devices manufactured by Digital Receiver Technology, Inc.; (2) specific geographic locations where FBI aircraft equipped with IMSI catchers are or have been employed; (3) communications, agreements, and associations with state agencies concerning the devices operated from airplanes; and (4) the specific capabilities and technical specifications of any IMSI

3

devices operated from airplanes.  *Id.*  Lastly, the letter advised that as to the remaining portions of EFF's request, the FBI was conducting a search reasonably calculated to locate responsive records.  *Id.*

By letters dated September 15, October 15, November 16, 2015, and December 15, 2015, the FBI made four releases of non-exempt records responsive to EFF's request.  *See* Exs. F to I Hardy Decl.[2]  In total, the FBI reviewed 1325 pages, producing 82 pages in full and withholding 198 pages as duplicates and 617 pages in part and 428 pages in full pursuant to FOIA exemptions.  Hardy Decl. ¶ 3.

**B.  Criminal Division's Response to EFF's FOIA Request.**

By letter dated July 8, 2015, the Criminal Division made its first production in response to EFF's request, releasing 18 pages in full.  Sprung Decl. ¶ 11.   By letter dated August 6, 2015, the Criminal Division made its second production, releasing 31 pages in full.  *Id.* ¶ 12.  On December 9, 2015, the Criminal Division provided Plaintiff with a draft Vaughn index of the twenty-four records being withheld in full.  *Id.* ¶ 10 n.2.  While processing the records, the Criminal Division located some records which originated with other components of the DOJ and referred those documents to those components for processing.  *Id.* ¶¶ 13-15.  It referred one document to the Office of Information Policy ("OIP"), 16 pages to the USMS and 17 pages to Drug Enforcement Administration ("DEA").  *Id.*

---

[2] As FBI explained in its letters, the FBI had referred some of the pages to the Office of Information Policy ("OIP") for consultation.  *Id.*  Based on that consultation, the FBI withheld certain of the referred pages in whole or in part in its production under Exemption 5.  *See infra* at 5.

**C. USMS's Response to EFF's FOIA Request.**

On August 5, 2015, the USMS sent a letter to EFF releasing a forty-one page document with portions of five pages redacted under Exemption 7E.  Bordley Decl. ¶ 9.  As noted above, the Criminal Division referred 16 pages to the USMS.  *Id. ¶* 10.  After reviewing these pages, the USMS sent EFF a letter dated January 12, 2016, producing two pages in full and withholding the other 14 pages under Exemptions 5 and 7(E).  *Id.*

By letter dated April 26, 2016, the USMS informed EFF that it had conducted a supplemental search which located additional responsive material.  *Id.* ¶ 13.   In the letter, the USMS explained that it was withholding 40 pages of vendor material under Exemption 4 and 7(E).  *Id.* The USMS also explained that it had referred Congressional letters to OIP for its review and direct response.  *Id.*

**D. OIP's Response to Documents Referred by the Criminal Division and the USMS.**

After reviewing the document referred by the Criminal Division, OIP sent EFF a letter enclosing the document with portions redacted pursuant to Exemptions 5, 6 and 7(C).  Declaration of Vanessa R. Brinkman ("Brinkmann Decl.") ¶ 6 and Ex. A.  With respect to the records referred by the USMS, OIP provided copies of the records to EFF by letter dated April 13, 2016.  *Id.* ¶ 11 and Ex. B.  OIP also reviewed documents forwarded by FBI for review (*see supra* at 4 n.2), and determined that certain records should be withheld in whole or in part under Exemption 5.

**E. DEA's Response to Document Referred by the Criminal Division**.

The Criminal Division referred a 17-page document to DEA for processing and a direct response.  Declaration of Katherine L. Myrick ("Myrick Decl.") ¶ 9.  After reviewing the

document, DEA sent EFF a letter dated December 17, 2015, explaining that it was withholding the document pursuant to Exemptions 5 and 7(E).  *Id.* ¶¶ 11-12.

## ARGUMENT
## I.   ITEM 1 OF EFF'S REQUEST FAILS TO REASONABLY DESCRIBE THE RECORDS SOUGHT.

A FOIA request must "reasonably describe[]" the records sought.  5 U.S.C. § 552(a)(3)(A)(i).  The legislative history indicates that the description would "be sufficient if it enable[d] a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort."  H. Rep. 93-876, 93d Cong., 2d Sess. 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6271.  Courts have explained that "[t]he rationale for this rule that the FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters."  *Assassination Archives & Research Ctr. v. CIA,* 720 F. Supp. 217, 219 (D.D.C. 1989), *aff'd in pertinent part,* No. 89-5414 (D.C. Cir. Aug. 13, 1990). Based on these concerns, courts have found that a request fails to meet the "reasonably described" requirement when it would require an agency to conduct an unreasonably burdensome search of a large volume of records in order to identify the responsive documents. *See, e.g., Am. Fed'n of Gov't. Employees v. U.S. Dep't of Commerce,* 907 F.2d 203, 209 (D.C. Cir. 1990).  Courts have also found that the request is not proper where it requires an agency to answer questions or to create records.  *See, e.g., Judicial Watch, Inc. v. Dep't of State,* No. 15-cv-690, 2016 WL 1367731 (D.D.C. April 6, 2016).

Item 1 of EFF's request seeks "the case name or docket numbers of all criminal cases, federal or state, open or closed, in which data collected from a [cell site simulator operated from planes] aided in arrest."  Ex. A to Hardy Decl.  This item of EFF's request fails to meet the statutory requirement that a FOIA request must "reasonably describe[]" the records sought for at

least two reasons.  First, this item is more in nature of a question asking the DOJ components to identify the particular cases in which the device was used than a request for records.  The FOIA does not require agencies to answer questions.  *Amnesty Int'l v. CIA,* No. 07-5435, 2008 WL 2519908, at *12-13 (S.D.N.Y. June 19, 2008) (agency properly denied a request seeking an identification of persons deemed subject to "secret detention" because the request, in essence, seeks an answer to a question); *Hudgins v. I.R.S.,* 620 F. Supp. 19, 21 (D.D.C. 1985), *aff'd,* 808 F.2d 137 (D.C. Cir. 1987) (request not proper when it "requires an agency to answer questions disguised as a FOIA request").  Nor does FOIA require an agency to create documents to produce the information sought.  *Krohn v. Dep't of Justice,* 628 F.2d 195, 197-98 (D.D.C. 1980); *Moore v. Bush,* 601 F. Supp.  2d 6, 14-16 (D.D.C. 2009); *West v. Spellings,* 539 F. Supp. 2d 55, 61 (D.D.C. 2008).  *Judicial Watch, Inc. v. Dep't of State,* 2016 WL 1367731, illustrates this limitation.  In that case, plaintiff requested records identifying the number and names of all current and former State Department officials "who used email addresses other than their assigned 'state.gov' email addresses to conduct official State Department business."  *Id.* at *3. The court found that the request "was actually a question posed as a request for records," namely "who at the State Department used private email for conducting official business?"  *Id.*  As the court explained, "an agency has no duty to answer a question posed as a FOIA request."  *Id.* Item 1 of EFF's request suffers the same flaw because it is in effect asking the agencies to identify the particular cases in which the device was used.

Second, even if the request is viewed as a request for records, it still fails to meet the statutory requirement because the FBI and the USMS records are not maintained in a manner that would permit their personnel to locate such records with a reasonable amount of effort.  The FBI and the USMS do not maintain their records in a manner that allows for the retrieval of

information correlating the case names and docket numbers of criminal cases "in which data collected from a device aided in the arrest."  Hardy Decl. ¶ 17; Bordley Decl. ¶ 15.  The FBI and the USMS do not index their investigative files or records by the investigative technique(s) utilized during the investigation; nor does it maintain separate database of criminal cases in which this technique was utilized.  Hardy Decl. ¶ 17; Bordley Decl. ¶ 15.  As a result, both the FBI and the USMS would be required to conduct a burdensome manual search and review of every criminal investigation file to determine if they contained records about use of a cell site simulator from an airplane that "aided in an arrest."  Hardy Decl. ¶ 17; Bordley Decl. ¶ 15.  As this district court recognized in *Judicial Watch, Inc. v. Dep't of State,* an agency is not "required to undertake a search that is so broad as to be unduly burdensome."  2015 WL 1367731, *3-4. Accordingly, Item 1 of EFF's request fails to meet the statutory requirement to "reasonably describe[]" the records sought.

## II.    THE USMS CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS.

EFF only challenges the adequacy of the search conducted by the USMS; it does not challenge the searches conducted by the FBI or the Criminal Division.  An agency is entitled to summary judgment in a FOIA case with respect to the adequacy of its search if the agency shows "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. U.S. Dep't of the Army,* 920 F.2d 57, 68 (D.C. Cir. 1990).  "There is no requirement that an agency search every record system."  *Id*.  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."  *Weisberg v. U.S. Dep't of Justice,* 745 F.2d 1476, 1485 (D.C. Cir. 1984).  An agency can establish the reasonableness of its search by "reasonably detailed, nonconclusory

affidavits describing its efforts." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312,

318 (D.C. Cir. 2006).  "Agency affidavits are accorded a presumption of good faith, which

cannot be rebutted by 'purely speculative claims about the existence and discoverability of other

documents.'" *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).

The declaration of William E. Bordley, Associate General Counsel and the FOIA/Privacy

Act Officer of the USMS, demonstrates that the USMS conducted an adequate search for records

responsive to EFF's request.  Bordley Decl. ¶¶ 5-6, 11.  Based on the specific records requested

by EFF, Mr. Bordley determined that the USMS offices likely to possess responsive records, if

any, were (1) the USMS Investigative Operations Division, including the Technical Operations

Group ("TOG"), (2) the Office of General Counsel, and (3) the Office of Congressional Affairs.

*Id.*  The TOG is the component responsible for providing technical equipment and support to

USMS law enforcement personnel as necessary to carry out their duties to apprehend fugitives or

persons for whom a warrant has been issued.  *Id.* ¶ 5.  The Office of General Counsel is

responsible for providing legal advice, review, and litigation support for the USMS.  *Id.*  The

Office of Congressional Affairs is the only office within the USMS that is authorized to

communicate with members of Congress and congressional staff on behalf of the USMS.  *Id.*

The USMS then initiated a search request to these three offices for all paper and

electronic records for the category of records specified by EFF's request, *i.e.* records pertaining

to "'dirtboxes' or other IMSI catcher devices operated from planes" from January 1 2007, until

"the present." *Id.* ¶ 6.  The search request specified the specific subcategories set forth in

Plaintiff's letter and attached a copy of Plaintiff's letter.  *Id.*  Based on that search, the USMS

identified one record.  *Id.*  On February 1, 2016, the USMS initiated a supplemental search for

records which identified additional pages.  *Id.* ¶¶ 11-12.

By conducting a search of those USMS offices deemed reasonably likely to possess responsive records, the USMS employed a reasonable and adequate search "using methods which can be reasonably expected to produce the information requested." *Oglesby,* 920 F.2d at 68.

### III.   THE FBI'S REFUSAL TO CONFIRM OR DENY THE EXISTENCE OF CERTAIN RECORDS SOUGHT BY EFF IS APPROPRIATE UNDER EXEMPTIONS 3 AND 7(E).

In its response to EFF's FOIA request, the FBI stated that it could neither confirm nor deny the existence of certain categories of records sought by the request.  *See* Ex. F to Hardy Decl.[3]  The invocation of such a *Glomar* response is appropriate when "to confirm or deny the existence of records . . . would cause harm cognizable under a FOIA exemption."  *Gardels v. CIA,* 689 F.2d 1110, 1103 (D.C. Cir. 1982).  *Glomar* responses have been upheld by courts in the context of various exemptions, including Exemption 3 and 7(E).  *See Hunt v. CIA,* 981 F.2d 1116, 1118-19 (9th Cir. 1992) (Exemptions 1 and 3); *Valzquez v. Dep't of Justice,* 887 F. Supp. 2d 114, 116-17 (D.D.C. 2012) (Exemption 7(E)); *Catledge v. Mueller,* 323 Fed. Appx 464, 467 (7th Cir. 2009) (Exemptions 7(E)).

In this case, the FBI properly invoked Exemptions 3 and 7(E) to refuse to confirm or deny the existence of records on the following four topics mentioned in EFF's request: (1) records concerning devices manufactured by Digital Receiver Technology, Inc. ("dirtboxes") (paragraph 2 of EFF's request); (2) specific geographic locations where FBI aircraft equipped with IMSI catchers are or have been employed (items 2(a) and 2(g) of the request); (3)

---

[3] The refusal to confirm or deny the existence of records responsive to a FOIA request is typically called a *Glomar* response, named after the case *Phillip v. Central Intelligence Agency,* 546 F.2d 1009 (D.C. Cir. 1976), in which the Central Intelligence Agency successfully defended its refusal to confirm or deny the existence of records regarding a ship, the Hughes Glomar Explorer.

communications, agreements, and associations with state agencies concerning the devices

operated from airplanes (item 2b of the request); and (4) the specific capabilities and technical

specifications of any IMSI device operated from airplanes (items 3 and 5 of the request).  Hardy

Decl. ¶¶ 18-33.

    **A.  FBI's *Glomar* Response Is Proper Under Exemption 7(E).**

Exemption 7(E) protects records or information that "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for

law enforcement investigations or prosecutions if such disclosure could reasonably be expected

to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Courts are divided as to whether the

phrase "if such disclosure could reasonably be expected to risk circumvention of the law" applies

only to "guidelines" or also applies to "techniques and procedures."  *See Pub. Emps. for Envtl.*

*Responsibility  v. Int'l Boundary Water Comm'n,* 740 F.3d 195, 204 & n.4 (D.C. Cir. 2014)

(hereafter cited as "*PEER*").  However, the better reasoned decisions recognize that providing

categorical protection to "techniques and procedures" (i.e., not requiring a showing that

"disclosure could reasonably be expected to risk circumvention of the law") is consistent with

both the plain meaning of the statute and the history of the amendments to exemption (7)(E) in

1986.  *See Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681 (2d Cir.

2010) (finding that the "sentence structure of Exemption (b)(7)(E)" and "basic rules of grammar

and punctuation dictate that the qualifying phrase modifies only the . . . 'guidelines' clause" and

that "[a]ny potential ambiguity in the statute's plain meaning is removed . . . by the history of the

statute's amendments").  *See also, e.g.*, *Hamdam v. U.S. Dep't of Justice,* 797 F.3d 759, 777 (9th

Cir. 2015); *Durrani v. U.S. Dep't of Justice*, 607 F. Supp. 2d 77, 91 (D.D.C. 2009) (techniques

and procedures entitled to categorical protection under (7)(E)); *Jewett v. U.S. Dep't of State*, No.

11-cv-1852 RLW, 2013 WL 550077, at *9 (D.D.C. Feb. 14, 2013); *Labow v. U.S. Dep't of Justice*, 66 F. Supp. 3d 104, 126 (D.D.C. 2014).

Even if a showing that "disclosure could reasonably be expected to risk circumvention of the law" were required to protect these "techniques and procedures" from disclosure, the "risk circumvention of the law" requirement presents a "low bar." *See PEER*, 740 F.3d at 204-05 & n.4 (saying that "it is not clear" that the issue of whether an agency needs to show that disclosure of a technique or procedure could reasonably be expected to risk circumvention of the law "matters much in practice" given the "low bar" for the circumvention requirement). "[T]he text of exemption 7(E) is much broader" than other exemptions that "set a high standard." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] 'demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'" *Id.* (citation omitted). Therefore, Exemption 7(E) "exempts from disclosure information that could increase the risks that a law will be violated or that past violators will escape legal consequences." *Id.* at 1193.

The FBI meets that the standard for Exemption 7(E) with respect to its *Glomar* response for certain categories of records. As Mr. Hardy explains in his declaration, cell site simulator devices (which EFF describes as IMSI catchers) are used by the FBI as an investigative technique in criminal and national security investigations. Hardy Decl. ¶ 21. Although the FBI has publicly acknowledged its possession and law-enforcement employment of cell site simulator devices, such acknowledgement has been limited to general disclosures concerning the possession and use of these devices, comprising: (a) broad legal and procedural requirements for employing the devices; (b) identification of FBI organizations responsible for acquiring, testing,

and maintaining the devices; (c)  non-specific details about the FBI's acquisition of the devices;

(d) non-specific information about the training of employees responsible for using the devices;

(e) a select number of non-disclosure agreements executed by state and local law enforcement

agencies desiring to acquire the devices; (f) in a few limited cases, manufacturers and models of

older devices the FBI now considers obsolete; and, recently, (g) the FBI's generalized

acknowledgment of the use of such devices operated from airplanes.  *Id.* ¶ 19.  Despite the above

limited disclosures, the FBI has protected information concerning the non-public details about its

use of cell site simulator devices, including: (a) the specific makes and models of its current-

generation equipment; technical specifications of the different devices; (b) capabilities and

limitations of the various devices; (c) specific field office capabilities for deploying the

equipment; (d) the numbers and locations of bureau employees trained to operate the devices;

and (e) details about the deployment platforms or methods in which the FBI's devices are

operated.  *Id.* ¶ 20.

      Here, specific portions of EFF's request seeks records concerning (1) cell site simulator

devices of a particular manufacturer -- Digital Receiver Technology, Inc. ("Dirtboxes")

(paragraph 2 of page 2 of request), (2) specific geographic areas in which the devices have been

deployed (items 2a and g), (3) specific capabilities of the devices (items 3 and 5), and (4)

communications, agreements and associations with state agencies concerning devices operated

from airplanes (item 2b).  *See* Ex. A to Hardy Decl.   The mere acknowledgment of the existence

or nonexistence of any such records would automatically provide key, non-public details about

FBI's operational information regarding use of cell site simulators as an investigative technique.

Hardy Decl. ¶ 22.  As explained, the FBI has not acknowledged the current vendors of its cell

site simulators devices (much less the vendors of any devices used from airplanes), the

geographic areas in which such devices are deployed, or the specific capabilities of such devices. Hardy Decl. ¶ 30.  Nor has the FBI acknowledged any communications, agreements or associations with state agencies concerning devices operated from airplanes.  *Id.*  Requiring the FBI to confirm or deny the existence of records on these topics would be tantamount to revealing details about the capabilities of the devices and the FBI's ability to use them in specific locations.  *Id.*  Such non-public details regarding investigative techniques used by law enforcement are exactly the type of sensitive information that are categorically protected by Exemption 7(E).

Moreover, even if Exemption 7 requires a showing that disclosure of such details regarding investigative techniques could be reasonably be expected to risk circumvention of law, the FBI has demonstrated the risk of such harm.  As Mr. Hardy explains, confirming or denying the existence of records responsive to these aspects of EFF's request would allow targets to gain knowledge about the FBI's and other law enforcement's ability or inability to deploy cell site simulator devices from airplanes.  Hardy Decl. ¶ 31.  Learning of the FBI's and other law enforcement's deployment capabilities would allow targets to alter their modes and routes of transportation, geographic areas of operation, and/or modes of communication.  *Id.* Additionally, confirming or denying the existence of records concerning specific manufacturers of FBI equipment would allow targets to gain insight into the specifications and operational capabilities of the FBI's devices, thus allowing targets to alter their transportation or communication patterns based on the known limitations of specific manufacturers' equipment. *Id.*  This concern is particularly heightened if a manufacturer has filed a patent on a particular device that is publically accessible.  *Id.*  Therefore, the FBI's *Glomar* response for the four categories was proper under Exemption 7(E).

**B. FBI's *Glomar* Response is Proper under Exemption 3.**

Exemption 3 applies to the matters "specifically exempted from disclosure by statute . . . [provided that such statute] (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  As the D.C. Circuit has explained, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for [the] decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage."  *Goland v. CIA*, 607 F.2d 339, 350-51 (D.C. Cir. 1978), *cert. denied*, 445 U.S. 927 (1980).  Consequently, under Exemption 3, judicial review is limited to whether (1) the withholding statute qualifies as an Exemption 3 statute, and (2) the withheld material satisfies the criteria of the exemption statute.  *See DiBacco v. U.S. Army*, 795 F.3d 178, 197 (D.C. Cir. 2015); *CIA v. Sims*, 471 U.S. 159, 167 (1985); *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990).

Section 102A(i)(1) of National Security Act of 1947 ("National Security Act"), as amended, requires that the Director of National Intelligence, and by extension each component of the intelligence community, "protect intelligence sources and methods from unauthorized disclosure."  See 50 U.S.C. § 3024(i)(1) (formerly codified at 50 U.S.C. § 403-1(i)(1)).  It is well-established that this statute qualifies as a withholding statute for purposes of Exemption 3. *See, e.g., DiBacco*, 795 F.3d at 183; *Sims*, 471 U.S. at 168-699; *Krikorian v. Dep't of State*, 984 F.2d 461, 465-66 (D.C. Cir. 1993); *Goland*, 607 F.2d at 350-51.  Indeed, the Supreme Court has recognized the "wide-ranging authority" provided by the National Security Act to protect intelligence sources and methods, noting that, rather than limit the scope of the Act, "Congress

simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the [a]gency needs" to gather and analyze intelligence. *Sims*, 471 U.S. at 169-70, 177.

In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. §§ 3024(i)(2)(A), (B). The FBI is one of 17 member agencies comprising the IC, and as such must protect intelligence sources and methods. Hardy Decl. ¶ 25.

When, as here, an agency provides a *Glomar* response pursuant to Exemption 3, the only question for the Court is whether the agency has demonstrated that answering the request "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *See Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980). Here, given the FBI's dual mission as both a law enforcement and an intelligence agency, cell site simulators function as both a law enforcement technique or procedure as well as an intelligence source and method. Hardy Decl. ¶¶ 26, 32. Hence, confirming or denying the existence of the records on the specified topics would disclose the limits and capabilities of FBI's sources and methods. Hardy Decl. ¶¶ 26, 32. Accordingly, the FBI properly asserted a *Glomar* response to the specified categories of records.

## IV.   DEFENDANT PROPERLY WITHHELD INFORMATION UNDER APPLICABLE EXEMPTIONS.

The FOIA represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of

information and provided nine specific exemptions under which disclosure could be refused."

*FBI v. Abramson*, 456 U.S. 615, 621 (1982).  While these exemptions are to be "narrowly

construed," *id.* at 630, courts must not fail to give them "meaningful reach and application."

*John Doe*, 493 U.S. at 152.

"An agency that has withheld responsive documents pursuant to a FOIA exemption can

carry its burden to prove the applicability of the claimed exemption by affidavit." *Larson v.

Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).  "[S]ummary judgment is warranted on the

basis of agency affidavits when the affidavits describe the justifications for nondisclosure with

reasonably specific detail and are not controverted by either contrary evidence in the record nor

by evidence of agency bad faith." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citation and

internal quotation marks omitted).  "Ultimately, an agency's justification for invoking a FOIA

exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* at 374-75 (citation omitted).

For the reasons discussed below, withholdings made by the various DOJ components are

appropriate.

### A.  The FBI Properly Withheld Information Pursuant to Exemption 1.

Exemption 1 protects from disclosure records that are "(A) specifically authorized under

criteria established by an Executive order to be kept secret in the interest of national defense or

foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C.

§ 552(b)(1).  An agency establishes that it has properly withheld information under Exemption 1

for a particular record if it shows that it has met the classification requirements of the Executive

Order in effect when the final classification action was taken.  *Campbell v. U.S. Dep't of Justice,*

164 F.3d 20, 29-30 (D.C. Cir. 1998).  A court must give "substantial weight" to agency affidavits

supporting the withholding of classified information, *ACLU v. U.S. Dep't of Def.,* 628 F.3d 612,

619 (D.C. Cir. 2011), and must defer to the expertise of the agencies involved in national security and foreign policy. *See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 927 (D.C. Cir. 2003); *Frugone v. CIA,* 169 F.3d 772, 775 (D.C. Cir. 1999); *Fitzgibbon,* 911 F.2d at 766.

Under Executive Order 13,526, information may be classified if it meets four requirements: (1) an original classification authority classifies the information; (2) the information is owned, produced by or for, or under the control of U.S. Government; (3) the information falls within one or more of the protected categories listed in section 1.4 of the Order; and (4) the original classification authority determines that unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damages. Exec. Order No. 13,526, 75 Fed. Reg. 707, § 1.1(a) (Dec. 29, 2009).

The FBI withheld 177 pages in whole or in part under Exemption 1. Hardy Decl. at page 23 n. 15. The Hardy Declaration demonstrates that the FBI has adhered to the procedures set forth in Executive Order 13,526 in determining that the information withheld pursuant to Exemption 1 is classified. *See* Hardy Decl. ¶¶ 41-47. The Attorney General has designated Mr. Hardy as an original classification and declassification authority. *See* Executive Order 13,526 §§ 1.1(a)(1), 1.3; Hardy Decl. ¶ 2. Mr. Hardy ensured that the procedural requirements of Executive Order 13,526 were followed for this FOIA request, including proper identification and marking of documents. *See* Hardy Decl. ¶ 44.

The classified information withheld in this case also meets the substantive requirements of Executive Order 13,526. The withheld information is under control of the United States Government, and contains information regarding intelligence activities, sources or methods,

which is an authorized basis for classification.  *See* Executive Order 13,526 §1.4(c); Hardy Decl. ¶ 45.  Mr. Hardy further determined that release of this information reasonably could be expected to cause serious damage to the national security of the United States, and therefore continues to warrant classifications at the "Secret" level.  Hardy Decl. ¶¶ 44-45, 47.  As Mr. Hardy explained, an intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of a national security interest.  *Id.* ¶ 46.  An intelligence method is used to indicate any procedure utilized to obtain information concerning such individual or organization.  *Id.*  An intelligence activity or method has two characteristics.  *Id.*  First, the intelligence activity or method – and information generated by it – is needed by U.S. intelligence/counterintelligence agencies to carry out their missions.  *Id.*  Second, confidentiality must be maintained with respect to the activity or method for the viability, productivity and usefulness of its information to be preserved.  *Id.*  In this case, the redactions were made to protect from disclosure information that reveals the intelligence activities and methods used by the FBI and its intelligence gathering capabilities in intelligence and counterintelligence investigations.  *Id.* ¶ 47.  The FBI protected the information because disclosure could reasonably be expected to cause serious damage to the national security and could disrupt current national security investigations.  *Id.* As a result, Mr. Hardy determined that this information is properly classified at the "Secret" level, is properly classified pursuant to E.O. 13,526 § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

### B.  The FBI Properly Withheld Information Pursuant to Exemption 3.

Exemption 3 applies to the matters "specifically exempted from disclosure by statute . . . [provided that such statute] (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding

or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). As explained

*supra* at 15 judicial review is limited to whether (1) the withholding statute qualifies as an

Exemption 3 statute, and (2) the withheld material satisfies the criteria of the exemption statute.

*See Sims*, 471 U.S. at 167; *DiBacco,* 795 F.3d at 197.

In this case, the FBI invoked Exemption 3 to withhold certain pages in whole or in part

because they contained information protected by the National Security Act , 50 U.S.C. §

3024(i)(1). Hardy Decl. ¶¶ 51-53.[4] As previously explained, that Act requires that the Director

of National Intelligence, and by extension each component of the intelligence community,

"protect intelligence sources and methods from unauthorized disclosure." *See* 50 U.S.C. §

3024(i)(1) (formerly codified at 50 U.S.C. § 403-1(i)(1)). Given the FBI's dual mission as both a

law enforcement and intelligence agency, these devices function both as a law enforcement

technique or procedure as well as an intelligence source or method. Hardy Decl. ¶ 51.

Accordingly, disclosure of the withheld information would reveal information protected by the

National Security Act as a source and method. *Id.*

### C.   The FBI and the USMS Properly Withheld Record Pursuant to Exemption 4.

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial

information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4).

Unlike other types of information, materials implicating Exemption 4 are generally procured

from third parties, rather than developed within the agency. *Judicial Watch v. FDA*, 449 F.3d

141, 148 (D.C. Cir. 2006). Therefore, the Exemption is intended to protect the interests of both

---

[4] Some of the pages withheld in whole or in part under Exemption 3 also were withheld under
Exemption 1. In addition, the FBI has asserted Exemption 7(E) in conjunction with Exemption
3. Hardy Decl.¶ 51.

the government and submitters of information.  *See Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767-70 (D.C. Cir. 1974).

In *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992), the D.C. Circuit explained that material may be withheld as "financial or commercial information" pursuant to Exemption 4 under two circumstances.  First, information provided to the government on a voluntary basis is confidential for purposes of Exemption 4 "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 147 (D.C. Cir. 2001) (quoting *Critical Mass*, 975 F.2d at 879).  On the other hand, financial or commercial information provided to the government on a mandatory basis is confidential if "disclosure would be likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'"  *Id.*  at 147-48 (quoting *Critical Mass*, 975 F.2d at 878).

The records withheld by the FBI and the USMS meet the requirements for Exemption 4. Hardy Decl. ¶¶ 54-58; Bordley Decl. ¶ 25.  The records withheld by the FBI consists of training material and a product status guide voluntarily submitted by a vendor.[5]  Hardy Decl. ¶ 55.  The materials contain technical information (including specific information about how the products work, what the products do, and the various capabilities of the products) that is the result of years of product research and development efforts at considerable expense to the vendor.  *Id.* ¶ 57. The materials contain detailed information on various features and functions of the products referenced in the documents.  *Id.*  The materials were submitted voluntarily to DOJ, *i.e.,* this

---

[5]  The FBI also withheld the records under Exemptions 3 and 7(E).  Hardy Decl. ¶ 51.  The FBI has also submitted an *ex parte, in camera* declaration by the vendor in support of the withholding under Exemption 4.  The vendor's name is protected from release pursuant to Exemptions 3 and 7(E).  Hardy Decl. at page 27 n.20.

information was not required to be submitted to the DOJ as part of the vendor's contract performance.  *Id.*  In addition, the vendor does not customarily provide this information to the public and has taken steps to protect the secrecy of the material by marking them as "[Vendor] Proprietary Information].  *Id.*  The vendor has stated that release of the information contained in the materials would cause substantial competitive harm to the vendor because the market has a limited number of competitors and the disclosure of the information would allow the vendor's competitors to benefit from the vendor's product development and research efforts and expenditures, thereby reducing the vendor's competitiveness in the market. *Id.*

The records withheld by the USMS consist of seven 2-page technology brochures and a 26-page technology training presentation.  Bordley Decl. ¶ 25.[6]  They were voluntarily submitted by a vendor and contain confidential proprietary information  which is not the kind that is customarily disclosed to the public.  *Id.*  Disclosure of the information would enable competitors to determine the nature of the technology, its operation, and its specific features.  *Id.*  As such, competitors of the vendor would be able to discern the specific technology which may be applicable to the USMS enforcement needs.  *Id.*

Therefore, the FBI and USMS properly withheld records pursuant to Exemption (b)(4).

**D.  Defendant Properly Withheld Information Pursuant to Exemption 5.**

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5).  Records are exempt from disclosure if they would be "normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Thus, Exemption 5 incorporates the privileges that are available to an agency in civil litigation,

---

[6] These documents are also being withheld under Exemption 7E because they would reveal sensitive, non-public information regarding investigative techniques.  *Id. ¶ 23.*

including the deliberative process, work product doctrine and attorney client privileges.  *See id.*

at 148-50.  Five DOJ components -- the Criminal Division, the USMS, the FBI, OIP and the

DEA -- withheld records in whole or in part under Exemption 5.

### 1.  The Criminal Division Properly Withheld Records under Exemption 5.

The Criminal Division has invoked Exemption 5 to withhold records protected by the

attorney work product and the deliberative process privileges.  Sprung Decl. ¶¶ 16-21. The

attorney work product privilege protects materials prepared by an attorney in anticipation of

litigation.  *Hickman v. Taylor,* 329 U.S. 495, 509-10 (1947).   In this case, the Criminal Division

is withholding 24 records protected by the work product privilege.  Sprung Decl. ¶ 16.  They fall

into three categories:

a)   Email messages and related attachments, including draft template applications and orders authorizing the use of cell-site simulators in particular criminal investigations, in which legal advice and other assistance is sought from or provided by Criminal Division subject matter experts about issues relating to the use of cell-site simulators in particular criminal matters.  These emails contain the attorneys' mental impressions concerning the matters in question.

b)   Template applications and proposed orders authorizing the use of cell site simulators in particular criminal investigations.  These templates are drafted by Criminal Division legal advisors for the use of prosecutors and agents working on active investigations.  The legal advisors periodically update the templates in light of their assessment of evolving legal standards.  The templates contain "usage notes," which incorporate legal analysis and guidance, and provide advice on what information to include in the specific situation so as to satisfy the court that the application is sufficient.  These documents anticipate a foreseeable prosecution of the individuals implicated in the investigation of the criminal activity in which the template will be used, and are disseminated with an eye toward prevailing on motions to suppress to be filed by prospective criminal defendants.

c)   Legal guidance and legal research memorandums concerning issues surrounding the use of cell site simulators in particular criminal cases.  This includes guidance issued to federal prosecutors by the Criminal Division in the wake of the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), concerning the

> implications of that decision for the use of additional investigative techniques, including a cell-site simulator.

*Id.* Each of these documents was prepared by an attorney who was acting at the behest of a client (the U.S. Government) or someone acting at the direction of such an attorney. *Id.* ¶ 18. The documents are protected work product because they were created in anticipation of foreseeable litigation, *i.e.*, a criminal prosecution of the individuals allegedly involved in the criminal activity that is the focus of the investigations in which the cell-site simulators were to be used. *Id.* For example, CRIM-EFF 00216-269 is a guidance memorandum authored by the Chief of the Criminal Appellate Section to assist federal prosecutors with recurring litigation issues related to the *Jones* decision that have arisen in current litigation and is intended to convey litigation strategy. *Id.* ¶ 16c. Courts have repeatedly held that the work product privilege covers these types of records. Indeed, another district court has already held that the work product privilege applies to CRIM-EFF 0216-269. *See ACLU of Northern Calif. v. Dep't of Justice,* 70 F. Supp. 1018, 1033-34 (N.D. Cal. 2014).

The Criminal Division is also withholding 17 of these same records under the deliberative process privilege. Sprung Decl. ¶ 19. The deliberative process privilege protects intra- or inter-agency documents that are both "predecisional and deliberative." *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A document is predecisional if "it was generated before the adoption of an agency policy" and it is deliberative if "it reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980). The deliberative process privilege therefore applies broadly to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.*

The documents at issue fall squarely within this privilege.  The records withheld are email messages and related attachments, *e.g.*, draft template applications for court orders, between Criminal Division subject matter experts and attorneys and agents working for law enforcement agencies in which advice is sought from or provided about legal issues relating to the use of a cell-site simulator.  Sprung Decl. ¶ 21.  The Criminal Division also withheld legal memorandums addressing questions raised about the use of cell site simulators in the course of criminal investigations.  *Id.*  These documents are pre-decisional and reflect the give-and-take that was part of the formulation of the Government's legal position in a particular investigation or prosecution.  *Id.*  Each of these documents is covered by the deliberative process privilege because it: (1) was created before the making of an official decision, *i.e.*, what to include in the Government's application for a court order authorizing the use of a cell-site simulator; and (2) reflects the give-and-take of the consultative process concerning the drafting of those applications.  Disclosure of this information would discourage open and frank communications among government attorneys and law enforcement agents.  Courts have consistently upheld similar documents under the deliberative process privilege.  *See, e.g., Gov't Accountability Project v. U.S. Dep't of Justice,* 852 F. Supp. 2d 14, 26 (D.D.C. 2012) (e-mails regarding whether to pursue prosecution of a case); *Heggestad v. U.S. Dep't of Justice,* 182 F. Supp. 2d 1, 7-12 (D.D.C. 2000) (documents related to the decisionmaking process of whether to prosecute taxpayer violations).   All of the records were therefore properly withheld by the Criminal Division under Exemption 5.

### 2.  The USMS Properly Withheld a Record under Exemption 5.

The USMS properly withheld a 14 page inter-Departmental memorandum protected by the work product and deliberative process privileges.  The memorandum was authored by an

USMS attorney and provides comments to the Criminal Division on a draft of a guidance memorandum for federal prosecutors concerning the implications of a Supreme Court decision (*United States v. Jones,* 132 S.Ct. 945 (2012)) for the use of various investigative techniques, including cell-site simulators.  Bordley Decl. ¶ 17.  The guidance memorandum, which was authored by attorneys in the Criminal Division, was created to assist federal prosecutors with recurring litigation issues related to the *Jones* that have arisen in current litigation and it intended to convey litigation strategy.  *See* Sprung Decl. ¶ 16c.  The comments provided by the USMS, like the draft guidance memorandum itself, were written in anticipation of foreseeable litigation regarding the *Jones* decision on the use of these techniques.  Bordley Decl. ¶ 18.  The comments on the draft guidance reflect the USMS attorney's opinions and analysis regarding the application of the case law to the use of particular investigative techniques.  *Id.*  As part of the legal analysis, the USMS attorney also addresses technical and operational information regarding specific law enforcement techniques.  *Id.*

This memorandum is also protected by the deliberative process privilege.  The comments reflect the author's preliminary analysis and opinions and were submitted to Criminal Division as part of the deliberative process in formulating guidance for federal prosecutors.  Bordley Decl. ¶ 17.  As such, the memorandum is a classic example of the types of documents protected by the deliberative process.

### 3.   The DEA Properly Withheld a Record under Exemption 5.

The 17 page inter-Departmental memorandum withheld by the DEA is similar in nature to the memorandum withheld by the USMS and is protected by the attorney work product and deliberative process privilege for the same reasons.  Myrick Decl. ¶¶ 15-18.  It is a memorandum authored by DEA attorneys and provides comments to the Criminal Division on the same draft of

a guidance memorandum for federal prosecutors.  *Id.*  Like the USMS memorandum, the comments on the draft guidance reflect the DEA attorneys' opinions and analysis regarding the application of the case law to the use of particular investigative techniques.  *Id.* at ¶¶ 15-16.

### 4.   The FBI Properly Withheld Information under Exemption 5.

The FBI withheld certain pages in whole or in part under the deliberative process and attorney-client privileges.  Hardy Decl. ¶¶ 59-65.  It invoked the deliberative process privilege to protect pre-decisional deliberations in e-mails and drafts of policy documents and reports.  *Id.*¶¶ 62-63.  Such deliberations and drafts were integral to the overall decision-making process.  *Id.* These e-mails and draft documents include preliminary draft comments and responses in regard to inquiries posed by Members of Congress in regard to cell site simulators.  *Id.* These internal records concern agency deliberations, analysis, sharing of opinions and draft recommendations during the preparation of agency responses for Congress and comments concerning the Department of Justice's preparation of a policy on the subject.  *Id.*  The records reflect an on-going dialogue among and between FBI personnel in the Operational Technology Division and the FBI's Office of General Counsel.  *Id.*  These internal "give and take" records are both (a) predecisional and (b) deliberative.  *Id.*  They are pre-decisional because they are antecedent to the adoption of agency policy and/or final decisions about inquiries concerning cell site simulators.  *Id.*  They are deliberative because they specifically reflect the internal discussions and formation of responses to Congress and policy regarding the subject.  *Id.*  Accordingly, the FBI appropriately asserted the Exemption 5 to protect these deliberative materials.

Some of these documents were also protected by the attorney-client privilege.  Hardy Decl. ¶¶ 64-65.  The attorney-client privilege protects "confidential communications between an attorney and his client relate[d] to a legal matter for which . . . the client has sought professional

advice." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 252 (D.C. Cir.

1977).  It protects not only the communication from a client to his/her attorney, but it "also

encompasses any opinions given by an attorney to his client based upon, and thus reflecting,

those facts," as well as "communications between attorneys that reflect client-supplied

information." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.,* 384 F. Supp. 2d 100, 114

(D.D.C. 2005).   Here, the FBI relied upon the attorney client privilege to protect e-mail

communications between and among FBI counsel and their FBI clients and employees reflecting

the seeking and/or providing of legal advice with respect to the operation of cell site simulator

devices.  Hardy Decl. ¶ 65.  These communications between clients and attorneys were made in

confidence, were not shared with or circulated to individuals outside the attorney-client

relationship, and were made for the purpose of securing legal assistance or advice.  *Id.*

Accordingly, the FBI properly withheld these privileged communications pursuant to Exemption

(b)(5)-2.   These records were also protected under the deliberative process privilege.

### 5.   OIP Properly Withheld Records under Exemption 5.

OIP withheld portions of an email referred by the Criminal Division under the

deliberative process privilege.  Brinkmann Decl. ¶¶ 16-20.  The email was from an employee in

the Office of Legislative Affairs to employees in various DOJ components regarding a briefing

of Congressional Staff concerning IMSIs.  *Id.* ¶ 17.  The withheld portions contain the

employee's preliminary opinions and analysis of the briefing's content and efficacy, and are part

of the exchange of ideas and assessments with other agency employees regarding matters

discussed at the briefing.  *Id.*  Such inter-agency exchanges are classic examples of information

protected by the deliberative process privilege.  *See, e.g., Judicial Watch, Inc. v. U.S. Dep't of

Justice,* 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (upholding the withholding of emails involving

recommendations and evaluation of how to respond to Congressional inquiries).  Such exchanges

of ideas and analysis are at the core of the decisionmaking process.  Brinkmann Decl. ¶¶ 17-19.

Disclosure of such preliminary assessments and opinions of individual employees would

severely hamper the efficient day-to-day workings of the DOJ as individuals would no longer

feel free to discuss their candid impressions, judgments and advice in email messages.  *Id.* ¶ 19.

OIP also reviewed the documents forwarded by FBI on consultation.  Brinkmann Decl. ¶

9.  Specifically, OIP determined that portions of documents EFF CELL 466, EFF CELL 482-

483, EFF CELL 491-492, and EFF CELL 500-502 should be withheld in part, pursuant to

Exemption 5 of the FOIA.  *Id.* ¶ 21.  These documents are internal email messages among

personnel within several components of the Department.  *Id.*  The information withheld from

within these documents is pre-decisional because it includes frank discussion and analysis made

during the formation of DOJ's policy guidance on the use of cell-site simulator technology

before the policy became final.  *Id.*  As noted above, these intra-agency emails are deliberative as

they include initial recommendations by Department personnel concerning the drafting and

development of agency policy on the use of cell-site simulators on which they have been asked

to give advice.  *Id.*  Furthermore, the email exchanges reflect input from various components

within the Department as they collaborate on the creation of a draft document and provide

specific input relevant to each components' subject matter expertise.  *Id.* ¶ 22 .

Additionally, OIP determined that documents EFF CELL 467-473, EFF CELL 475-481,

and EFF CELL 484-490 should be withheld in full under Exemption 5 of the FOIA.  *Id.* ¶ 9.

These documents are drafts of policy guidance and are pre-decisional as they were created prior

to the final version of the policy.  *Id.*¶ 23.  Additionally, these drafts are deliberative, in that they

contain the initial assessment and incorporated editorial commentary regarding the above-

mentioned draft cell-site simulator policy throughout the construction of the guidance.  *Id.*  A

significant part of the deliberative process within the Department involves the creation of draft

documents which are then reviewed, edited, and modified before they become final.  *Id.* ¶ 24.

Further, the drafts and email commentary regarding these drafts reflect the successive versions of

a document, showing the internal development of the Department's decision on the use of cell-

site simulator technology.  *Id.* ¶ 25. As such, release of these draft documents would undermine

the ability of DOJ staff to freely engage in unfiltered "give and take" which is critical to the

eventual development of well-reasoned guidance and policy.  *Id.*

### E.  Defendant Properly Withheld Information Pursuant to Exemption 7.

Exemption 7 protects from disclosure "records or information compiled for law

enforcement purposes" that fit within one of six categories.  5 U.S.C. § 552(b)(7).  A record is

considered to have been compiled for law enforcement purposes "if it was created or acquired in

the course of an investigation 'related to enforcement of federal laws,' and 'the nexus between

the investigation and one of the agency's law enforcement duties is based on information

sufficient to support at least a colorable claim of its rationality.'"  *Quinon v. FBI,* 86 F.3d 1222,

1228 (D.C. Cir. 1996) (citations omitted).  This inquiry requires "less exacting proof of a

legitimate law enforcement purpose" when the record belongs to "law enforcement agencies

such as the FBI."  *Id.* (alteration omitted); *accord Summers v. U.S. Dep't of Justice,* 517 F. Supp.

2d 231, 242-43 (D.D.C. 2007).

The records withheld by the FBI, the USMS and the DEA under Exemption 7 meet this

threshold.  The FBI is the primary investigative agency of the federal government with authority

and responsibility to investigate all violations of federal law not exclusively assigned to another

agency, to conduct investigations and activities to protect the United States and its people from

terrorism and threats to national security, and to further the foreign intelligence objectives of the United States.  Hardy Decl. ¶ 66; 28 U.S.C. §§ 533, 534; Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM") and 28 C.F.R. § 0.85.  Here, the records withheld by the FBI under Exemption 7 were compiled in furtherance of the FBI responsibilities of conducting criminal and national security investigations.  Hardy Decl. ¶ 66.

The USMS is the primary federal agency for fugitive investigations and is responsible for the execution of federal arrest warrants and assisting state and local agencies in locating their most violent fugitives.  *See* 28 U.S.C. §§ 561, 564, and 28 C.F.R. §§ 0.111(a) and (q).  The records and information withheld by the USMS pursuant to Exemption 7(E) were compiled in furtherance of its law enforcement responsibilities.  They pertain to law enforcement techniques and procedures used in performance of its fugitive apprehension and other law enforcement missions.  Bordley Decl. ¶ 20.

DEA is a law enforcement agency enforcing the controlled substances law and regulations.  Myrick Decl. ¶ 6.  Its investigative jurisdiction derives from the Controlled Substances Act, 21 U.S.C. § 801, *et seq*.  The memorandum withheld by DEA was compiled for law enforcement purposes.  Myrick Decl. ¶ 6.

Moreover, as explained below, the withheld information is protected by one of three categories – Exemptions 7(A), 7(D) and 7(E).

### 1.   FBI Properly Withheld Information under Exemption 7(A).

Exemption 7(A) applies to "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. §

552(b)(7)(A). To satisfy its burden, an agency need only demonstrate that (1) a law enforcement proceeding is pending or prospective, and (2) release of the information could reasonably be expected to cause articulable harm to the proceedings. *See Voinche v. FBI,* 46 F. Supp. 2d 26, 31 (D.D.C. 1999).

The information withheld by the FBI meets these requirements. The FBI has asserted Exemption (b)(7)(A) to protect the names, personal identifying information, file numbers, and activities of third-party subjects of pending FBI investigations in 15 pages. Hardy Decl. ¶ 68. The release of the names, identifying information, file numbers, and activities of third parties of on-going FBI investigations could result not only in the acknowledgment of the existence of the investigations, but also expose the identity of suspects, thereby jeopardizing the investigations. *Id.*

### 2. FBI Properly Withheld Information Under Exemption 7(D).

Exemption 7(D) permits the withholding or redacting of law enforcement records the release of which "could reasonably be expected to disclose the identity of a confidential source, including State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, or in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). A source is confidential within the meaning of [E]xemption 7(D) if the source provided information under an express assurance of confidentiality or in circumstances which such assurances could be reasonably inferred. *See Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995). Exemption 7(D)'s protection of confidential sources and

information provided by such sources applies regardless of whether the investigation is open or closed. *Ortiz v. U.S. Dep't of Health & Human Servs.*, 70 F.3d 729, 733 (2d Cir. 1995).

In this case, the FBI asserted Exemption 7(D) to protect two types of information: (1) the identity of and information provided by sources under implied assurances of confidentiality and (2) the identity of and information provided by a foreign government agency under express assurance of confidentiality.  Hardy Decl. ¶¶ 72-76.  With respect to the first category, the FBI withheld pages (in whole or in part) to protect the identity of and information provided by individuals who provided information about a criminal organization with a reputation for violence which was involved in a specific kidnapping investigation. *Id.* ¶ 73. These individuals were in a position to have access to knowledge about targets of the investigation. *Id.* Such access exposed them to potential significant harms should their association and cooperation with the FBI be publicly exposed and would make them a target for reprisal by the criminal organization. *Id.*  The disclosure of the identities of these sources and the information they provided could have disastrous consequences because disclosure could subject these third parties, as well as their families, to embarrassment, humiliation, and/or physical or mental harm. Courts have found that promises of confidentiality can inferred in such circumstances. *Billington v. Dep't of Justice,* 11 F. Supp. 2d 45, 67 (D.D.C. 2000) (concluding that investigation involving a violent organization is "exactly the type of serious offenses which would warrant" an inference of implied confidentiality), *aff'd in part and vacated in part and remanded on other parts,* 233 F.3d 581 (D.C. Cir. 2008); *Stephens v. Dep't of Justice,* 26 F. Supp. 3d 59, 72 (D.D.C. 2014) (withholding information provided by third party in investigation involving a violent gang).

The FBI also protected the identifying information (name, address, employer, telephone number, e-mail address, and other personal identifying information) of other individuals who

volunteered information to the FBI in this same investigation.  Hardy Decl. ¶ 74.  These individuals, who had no apparent connection to the investigation, provided information of value to the FBI concerning its investigation, and in doing so, have placed themselves in harm's way should their identity and cooperation with the FBI become known.  *Id.*  Under these circumstances, it is reasonable to infer that these third parties cooperated with the FBI only with the expectation of confidentiality.

The FBI also withheld certain pages (in whole or in part) to protect the identity the identity of and information provided by a foreign agency with an explicit understanding of confidentiality.  Hardy Decl. ¶ 75.  The FBI's decision to protect the identity of a foreign law enforcement agency is prescribed under the Foreign Government Information Classification Guide #1 ("G-1 Guide"), which is issued in accordance with E.O. 13,526, and other directives. Hardy Decl. ¶ 75.  The G-1 Guide governs classification of foreign government information that the foreign government has asked the FBI to protect and provides that the relationship of the foreign law enforcement agency with the FBI not be publically disclosed.  *Id.*  The FBI also protected the information provided by the foreign agency.  *Id.* ¶ 76.  The FBI, in connection with a variety of criminal and national security investigations, solicits and receives information from foreign agencies.  *Id.*  Inherent in the cooperation effort is the mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests.  *Id.*  If disclosure of the information provided in confidence were to be made public pursuant to FOIA and Privacy Act requests, cooperation between the FBI and the foreign agencies and authorities would be greatly diminished, causing great detriment to effective law enforcement.  *Id.*  Accordingly, the FBI

properly withheld this information under 7(D).  The FBI also protected this information under FOIA Exemptions (b)(1) and (b)(3).

### 3.   Defendant Properly Withheld Information under Exemption 7(E) .

The FBI, the USMS and the DEA withheld records in full or in part under Exemption 7(E), which protects records or information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  As explained *supra* at 11, the better reasoned decisions recognize that this exemption provides a categorical protection to "techniques and procedures" and do not require a showing that "disclosure could reasonably be expected to risk circumvention of the law."  But, even if such a showing were required to protect "techniques and procedures," the "risk of circumvention of the law" requirement presents a "low bar," which is met here.  *See PEER,* 740 F.3d at 204 n.4.

***FBI's Withholdings Under Exemption 7(E)*** The FBI withheld nine categories of information to protect investigative techniques and procedures:  (1) identity and/or location of FBI units, squads, or divisions with airborne cell site simulator capabilities; (2) technical information regarding cell site simulator devices; (3) targets of pen registers/trap and trace devices; (4) scope of the FBI's use of cell site simulators surveillance in specific investigations; (5) sensitive FBI file numbers; (6) investigative focus of specific investigations; (7) monetary expenditures for cell site simulator devices; (8) non-public details about how cell site simulator devices are deployed and (9) internal FBI intranet/web addresses.  Hardy Decl. ¶¶ 79-88.

Categories 1, 2, 4, 7, and 8 contain information specifically relating to the use of cell site simulator devices as an investigative technique.  While the FBI has publicly acknowledged its

possession and use of cell-site simulators, such acknowledgment has been limited to certain general information.  Hardy Decl. ¶ 19.  The FBI has not disclosed sensitive technical and operational information regarding its use of such devices.  *Id.* ¶ 20.  As courts have recognized, the fact that certain general information regarding the existence of a law enforcement technique is public does not preclude the government from withholding additional information regarding the technique.  *See, e.g. Showing Animals Respect & Kindness v. U.S. Dep't of Interior,* 730 F. Supp. 2d 180, 199-20 (D.D.C. 2010) (upholding withholding of details of wild life refuge surveillance where the general fact of surveillance is well-known but the location and timing of surveillance and equipment for such surveillance in not known to the public); *Barnard v. Dep't of Homeland Security*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (recognizing that '[t]here is no principle . . . that requires an agency to release all details concerning these and similar techniques simply because some aspects of them are known to the public.").

The categories of information withheld by the FBI regarding cell site simulators consist of sensitive, non-public details regarding this technology and its deployment.  The information withheld in Category 1 protects techniques and procedures specifically pertaining to the identity and/or locations of FBI units, squads, or divisions with airborne cell site simulator capabilities. Hardy Decl. ¶ 79.  The FBI has not disclosed which of its components and offices are capable of deploying cell site simulator devices from any platform, let alone from an airborne based platform.  *Id.*  Disclosure of these components and offices could reasonably be expected to risk circumvention of the law as this type of information would allow hostile elements to avoid or circumvent those locations where this surveillance technique is capable of being deployed.  *Id.* Likewise, the FBI has not disclosed the squads or units primarily responsible for the development of this technology and the advancements of this technique.  *Id.*  Revealing the

existence of these components and coordination of resources would reveal the level of the FBI advancements, field operations, planning, and operational application of this technique. *Id.* Providing this type of information would provide criminals and enemies of the United States with an idea as to where the FBI is focusing its limited resources. *Id.* Criminals, terrorists and hostile governments could then plan and structure their activities in a manner that avoids the FBI's strengths, exploits its weakness, steals its technological advancements, and allows them to circumvent the law. *Id.* Based on similar concerns, courts have upheld information regarding the location of various law enforcement units. *See, e.g., Al Turki v. Dep't of Justice,* No. 14-cv-0802, 2016 WL 1258581, at *30 (D. Colo. March 30, 2016) (location and identity of FBI units or joint units involved in an investigation); *Labow v. U.S. Dep't of Justice,* 66 F. Supp. 3d 104, 127 (D.D.C. 2014) (same).

Category 2 consists of technical data and specifications of the cell site simulator devices. Hardy Decl. ¶ 80. This information includes the operational capabilities and limitations, equipment specifications, and specific instructions for using particular devices. *Id.* This category of information also includes the names of the vendors of FBI cell site simulator devices and specific model names and numbers. *Id.* The revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important law enforcement technique, therefore allowing circumvention of the law. *Id.*

Category 4 consists of information about the scope of the FBI's use of cell site simulator surveillance in specific investigations. *Id.* ¶ 83. These details include the targets, dates, location, types of devices used, deployment platforms, and other details related to the scope of the surveillance and the circumstances of the underlying investigation. *Id.* Releasing this

information within the context of these documents would reveal examples of when and why the FBI decides to utilize cell site simulator devices and provide insight into the technical details about the devices and the locations from which the FBI possesses the ability to deploy them. *Id.* Revealing these non-public details about the FBI's use of these devices would provide criminals with an understanding of when they should expect the FBI to deploy this investigative technique, the capabilities and limitations of the technique, and places of deployment; thus making it easier for them to develop countermeasures to avoid disruption and detection by the FBI. *Id.*

Category 7 consists of information about the monetary amounts requested by FBI personnel and/or paid by the FBI in order to implement the FBI's cell site simulator surveillance programs. Hardy Decl. ¶ 86. The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions. *Id.* Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts. *Id.* This is turn would reveal how the FBI plans to allocate its limited resources and essentially paint a picture as to where the FBI's strengths and weaknesses lie within the spectrum of illegal activities it is mandated to investigate. *Id.* Releasing this information would give criminals and foreign agents the opportunity to structure their activities in a manner which avoids the FBI's strengths and exploits its weaknesses. *Id.*

Category 8 consists of other non-public details about how the FBI deploys of cell site simulator devices. *Id.* ¶ 87. While not consisting of technical data, these details nonetheless represent sensitive information concerning the devices such as logistical considerations of deployment, training procedures for FBI personnel, procurement and acquisition considerations, and, in the case of airborne deployment of the devices, non-public details about the FBI's

aircraft.  *Id.*  Release of this information would reveal insights to how and why the FBI uses

particular cell site simulator devices and from what platform, the FBI's capabilities to use the

devices in a particular geographic area, capabilities and limitations of the FBI's aircraft, and the

breadth of the FBI's cell site simulator programs.  *Id.* Revealing these non-public details about

the FBI's use of these devices would provide criminals with the full picture and understanding of

when they should expect the FBI to deploy this investigative technique and make it easier for

them to develop countermeasures to avoid disruption and detection by the FBI.  *Id.*

Accordingly, the FBI has demonstrated that disclosure of information in each of these

categories would reveal sensitive, non-public information regarding cell site simulators. While

some pieces of the information may appear innocuous in isolation, even minor details can be

combined in a mosaic fashion to reveal a broader understanding of the devices, thus enhancing

the risk of circumvention.  *Id.* ¶ 21 n. 2.  Courts have relied upon similar mosaic arguments to

withhold information under Exemption 7 and other FOIA exemptions.[7]  As the Supreme Court

cautioned, "bits and pieces" of data "may aid in piecing together . . . other information even

when the individual piece is not of obvious importance in itself."  *Sims,* 471 U.S. at 178 (quoting

*Halperin,* 629 F.2d at 150).  Here, disclosure of the withheld information could harm such

investigations by allowing criminals and terrorists to piece together information about cell site

simulators' use and capabilities and thereby develop methods to evade them.

Based on these concerns, courts have protected sensitive information regarding cell site

simulators. For example, in *United States v. Rigmaiden,* 844 F. Supp. 2d 982 (D. Ariz. 2012), the

---

[7] *Ctr for Nat'l Security Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 928, 933 (D.C. Cir. 2003)
(upholding Exemption 7(A) claim for names of individuals detained in the wake of the 9/11
attack and the dates and location of their arrests); *Sims,* 471 U.S. at 178 (Exemption 1);
*Cappabianca v.Commissioner,* 847 F. Supp. 1558, 1563 (M.D. Fla. 1994) (Exemption 2);
*Tinnken Co. v. U.S. Customs Serv.,* 491 F. Supp. 557, 559-560 (D.D.C. 1980) (Exemption 4).

court held that information regarding cell site simulators was protected by the federal common

law privilege for investigative techniques.  The court found that disclosure of the manufacturer

model information, instructions, user manuals and other technical and operational information

"would compromise the ability of the FBI and other law enforcement agencies to combat crime"

because it "would enable adversaries of law enforcement to defeat electronic surveillance

operations and to avoid detection by such surveillance." *Id.* at 994.  Similarly, in *Rigmaiden v.*

*Federal Bureau of Investigations,* No. CV 12-01605-PHX-DLR (BSB) (D. Ariz.), the court

upheld the FBI withholding of technical and operational information about cell site simulators

under Exemption 7(E), 5 U.S.C. § 552(b)(7)(A).  *See* Order dated December 14, 2015, ECF Doc.

159.

The FBI has also asserted Exemption 7(E) to protect other types of information not

directly related to cell site simulators.[8]  First, the FBI asserted Exemption 7(E) to protect FBI

sensitive case file numbers (Category 5).  Hardy Decl. ¶ 84.  The release of file numbering

convention identifies the investigative interest or priority given to such matters.  *Id.*  Applying a

mosaic analysis, suspects could use these numbers (indicative of investigative priority), in

conjunction with other information known about other individuals and/or techniques, to ascertain

how the FBI utilizes its surveillance resources and thus change their pattern of activity to avoid

detection, apprehension, or create alibis for suspected activities. *Id.*  Based on such concerns,

courts have found that case file numbers are protected by Exemption 7(E) as an investigative

technique.  *Al Turki,* 2016 WL 1258581, *29.

---

[8] The FBI also asserted Exemption 7(E) to protect two pages that would disclose the targets of
pen register/trap and trace devices (Category 3).  Hardy Decl. ¶ 82.  This information, however,
was also withheld under Exemption 6 and 7(C), which EFF is not contesting. *Id.* Therefore, the
issue of whether the information can also be protected under Exemption 7(E) is moot.

Second, the FBI has also asserted Exemption 7(E) to protect the investigative focus of specific FBI investigations mentioned (Category 6). Hardy Decl. ¶ 85. Revealing the broader investigative focuses within the FBI's various programs would reveal the scope and strategies it plans to pursue in its law enforcement initiatives. *Id.* Release of this type of information would allow criminals to gauge the FBI's strengths and weakness within certain investigative programs and structure their activities in a manner that avoids detection and disruption by the FBI. *Id.* For example, if terrorists knew that certain individuals were being investigated based on their association with one particular terrorist organization, they would be able to discern that their association with this particular group may cause them to be the subjects of an FBI investigation. *Id.* They may then decide to cut ties with this group and find different ways to pursue terrorism against the United States thus circumventing the FBI's counter-terrorism efforts.

Finally, the FBI asserted Exemption 7(E) to protect internal FBI intranet/web addresses (Category 9). Hardy Decl. ¶ 88. The FBI relies on these internal sites to convey sensitive and often classified information pertaining to its investigations between its many offices around the globe. Revealing these sites would allow criminals capable of cyber attacks to know where to go in the FBI's computer system to disrupt or undermine FBI initiatives. *Id.* Disruption could be achieved by deleting, manipulating, and/or corrupting the data housed at the web addresses and/or utilizing the information found there for nefarious purposes. *Id.* This would weaken the FBI's communications security and deprive the FBI of information critical to its law enforcement gathering mission, making the FBI much less effective at enforcing the law. *Id.* Courts have upheld the FBI's withholding of similar information pursuant to Exemption 7(E). *See Light v. Dep't of Justice*, 968 F. Supp. 2d 11, 29 (D.D.C. 2013); *Jewett v. U.S. Dep't of State*, No. 11-1852, 2013 WL 550077, at *9 (D.D.C. Feb. 14, 2013); *Labow,* 66 F. Supp. 3d at 126.

***USMS' Withholdings under Exemption 7(E)***   The USMS asserted Exemption 7(E) to
protect information in ten records.  First, the USMS withheld portions of five pages of a 40 page
Technical Operation policy (Document 1) which would reveal sensitive, non-public information
regarding investigatory electronic surveillance support measures, specialized counter-
surveillance, or capabilities and procedures for the use of electronic equipment.  Bordley Decl. ¶
21.  The disclosure of such information would allow subjects of USMS fugitive investigations
to employ countermeasures to avoid apprehension.  *Id.* Second, the USMS withheld portions of
seven pages of Document 2 (an inter-agency memorandum being withheld in full under
Exemption 5) because they would reveal sensitive, non-public information regarding law
enforcement techniques and procedures.  *Id.* ¶ 22.  The information would reveal the limitations
and capabilities of the techniques and how the techniques are deployed.  *Id.*  Disclosure of such
information could assist criminals in developing methods for evading detection and
apprehension.  *Id.*  Third, the USMS withheld seven vendor technology brochures (Documents 3-
9) and technology training materials (Document 10).  *Id.* ¶ 23.  These records contain model
names, technical specifications and capabilities of the technology.  *Id.*  The training materials
also contain details on how the device operates.  *Id.*  Disclosure of such details could enable
fugitives and other criminal elements to discern the sensitive non-public technical and
operational details which could then be used by fugitives or criminal elements to evade detection
or circumvent the law. *Id.*

***DEA's Withholdings under Exemption 7(E)***   DEA asserted Exemption 7(E), as well as
Exemption 5, to protect a 17 page memorandum providing comments to the Criminal Division.
Myrick Decl. ¶ 15.  As part of its legal analysis, the memorandum discusses sensitive, non-public
technical and operational information regarding cell site simulators and other law enforcement
techniques utilized by DEA, including details about how certain devices work and the
capabilities and limitations of such devices.  *Id.*  Knowing what can and cannot be done by such
devices and how they work could help criminals tailor or adapt their activities to evade

apprehension.  *Id.* According, the DEA properly invoked Exemption 7(E) to protect this document.

###### F.   Defendant Released All Reasonably Segregable Documents.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  The DOJ components met that burden here because each thoroughly reviewed all responsive records to achieve maximum disclosure consistent with the access provisions of the FOIA.  Hardy Decl. ¶ 89; Sprung Decl. ¶ 21; Bordley Decl. ¶ 26; Myrick Decl. ¶ 22; Brinkmann Decl. ¶  26. Where pages of records were released in part with redactions, the pages contained a mixture of material that could be reasonably segregated for release, material that was exempt from disclosure, and information that was inextricably intertwined with such material and therefore could not reasonably be segregated for release. Where pages were withheld in full, all information was either fully covered by one or more FOIA exemptions or any non-exempt information was so intertwined with exempt material that no information could be reasonably segregated for release.  Any further segregation of the intertwined material would have produced disjointed words, phrases, or sentences that, taken separately or together, would have minimal or no informational content.  *Id*.  *See Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776-77 (D.C. Cir. 2002) (agency demonstrated there was no reasonably segregable non-exempt information where it submitted affidavit showing that agency had conducted line-by-line review of each document withheld in full).

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendant's motion for summary

judgment.

Respectfully submitted,
BENJAMIN C. MIZER
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

   */s/ Marcia K. Sowles*
MARCIA K. SOWLES, Bar No. 36955
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone:     (202) 514-4960
Facsimile:     (202) 616-8470
Marcia.sowles@usdoj.gov

*Attorneys for Defendant*